**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **WANDA BONILLA**, on behalf of herself and all others similarly situated,<br>　　　　　　　　　　Plaintiff,<br>　　v.<br><br>**CARVER FEDERAL SAVINGS BANK**,<br>　　　　　　　　　　Defendant. | Case No.<br><br><br>**CLASS ACTION COMPLAINT** |

　　　　Plaintiff Wanda Bonilla, by counsel, and for her Class Action Complaint against the Defendant Carver Federal Savings Bank, alleges as follows:

## INTRODUCTION

　　　　1.　　　Plaintiff brings this action individually and on behalf of all similarly situated consumers against Defendant Carver Federal Savings Bank ("Carver Bank" or "Bank"), arising from its routine practices of (a) assessing more than one insufficient funds fee ("NSF Fee") on the same transaction; and (b) assessing an overdraft fee ("OD Fee") on transactions that did not actually overdraw checking accounts.

　　　　2.　　　Carver Bank's customers have been injured by the Bank's improper practices to the tune of millions of dollars bilked from their accounts in violation Carver Bank's clear contractual commitments.

　　　　3.　　　Plaintiff, on behalf of herself and two Classes of similarly situated consumers, seeks to end Carver Bank's abusive and predatory practices and force it to refund all of these improper charges. Plaintiff asserts a claim for breach of contract, including breach of the covenant of good faith and fair dealing, and seeks damages, restitution, and injunctive relief, as set forth more fully below.

　　　　4.　　　While there is nothing unlawful about assessing NSF Fees on accounts when such fees are assessed in compliance with contractual terms, NSF Fees in general have a crushing impact on persons

living paycheck to paycheck.  This is why the financial services industry is increasingly moving away from such fees.

5.      For example, one of the nation's largest consumer banks, Ally Bank recently stopped assessing overdraft fees altogether.  Diane Morais, Ally Bank's president of consumer and commercial banking, said that one reason is because NSF Fees disproportionately affect people who are living paycheck to paycheck and that NSF Fees disproportionately affect Black and Latino households. *Overdraft Fees Are Getting the Boot at Ally Financial*, The Wall Street Journal (June 2, 2021), https://www.wsj.com/articles/overdraft-fees-are-getting-the-boot-at-ally-financial-11622631600 (last accessed June 4, 2021).

6.      Indeed, Black households and those with low-to-moderate incomes are almost twice as likely to incur NSF Fees as white households or those with higher incomes, according to a report from the Financial Health Network, a research firm partly funded by financial institutions.

## PARTIES

7.      Plaintiff is a citizen and resident of Bronx, New York.

8.      Defendant Carver Bank is engaged in the business of providing retail banking services to consumers, including Plaintiff and members of the putative Classes. Carver Bank has its headquarters in New York, New York and operates banking branches throughout New York.

## JURISDICTION AND VENUE

9.       This Court has original jurisdiction of this action, among other reasons, under the Class Action Fairness Act of 2005. Pursuant to 28 U.S.C. §§ 1332(d)(2) and (6), this Court has original jurisdiction because (1) the proposed Class is comprised of at least 100 members; and (2) the aggregate claims of the putative class members exceed $5 million, exclusive of interest and costs.

10.    Venue is proper in this district pursuant to 28 U.S.C. § 1391 because Carver Bank is subject to personal jurisdiction here and regularly conducts business in this District, and because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this district.

**FACTUAL BACKGROUND AND GENERAL ALLEGATIONS**

**I.    CARVER BANK CHARGES MORE THAN ONE FEE ON THE SAME TRANSACTION**

11.    Prior to May 1, 2021, Carver Bank's Account Documents allowed Carver Bank to charge a *single* $35 NSF Fee when a transaction was returned for insufficient funds or paid despite insufficient funds.

12.    Carver Bank breached its Account Documents by charging more than one $35 NSF Fee on the same transaction, since the contract explicitly states—and reasonable consumers understand—that the same transaction can only incur a single NSF Fee.

13.    A recent Washington Post article discussed predatory overdraft fees, labeling NSF fees like those Carver Bank imposes as "indefensible" because "the customer gets hit with multiple charges for the same item." *I bought my kids dinner – and saw firsthand how overdraft fees punish the poor,* The Washington Post (October 1, 2021), https://www.washingtonpost.com/outlook/i-bought-my-kids-dinner--and-saw-firsthand-how-overdraft-fees-punish-the-poor/2021/09/30/32383c40-216e-11ec-b3d6-8cdebe60d3e2_story.html (last accessed October 8, 2021). The banks "are charging a fee for doing literally nothing.... [T]his is like asking a friend if I can borrow $20, only to have him take $10 out of my wallet for turning down my request." *Id*.

14.    Carver Bank's abusive practices are not standard within the financial services industry. Indeed, major banks like Wells Fargo—one of the largest consumer banks in the country—charge one NSF Fee per item, even if that item is resubmitted for payment multiple times. And while some other banks engage in the same practices as Carver Bank, their members agree to terms authorizing the fee practice.

15.     Until May 1, 2021, Carver Bank's Account Documents did not say that Carver Bank may repeatedly charge customers multiple fees on a single transaction. To the contrary, the Account Documents indicated Carver Bank will only charge a single NSF Fee on a transaction.

**A.      Plaintiff's Experiences.**

16.     In support of her claim, Plaintiff offers examples of fees that should not have been assessed against her checking account. As alleged below, Carver Bank: (a) reprocessed previously declined transactions; and (b) charged an additional fee upon reprocessing.

17.     For example, on January 14, 2021, Plaintiff was charged $35 OD Fees on transactions which were resubmitted by the merchant for payment without Plaintiff's request to reprocess the transactions. The re-submitted transactions were specifically labeled as "RETRY PYMT" on her statements.

18.     Each merchant request for payment was for a single transaction and, as is laid out in Carver Bank's Account Documents, should be subject to, at most, a single NSF or OD Fee (if Carver Bank returned it or paid it).

**B.      The Imposition of Multiple Fees on a Single Transaction Violates Carver Bank's Express Promises and Representations.**

19.     Before May 1, 2021, Carver Bank's Account Documents stated that the Bank will assess a single fee of $35 for a transaction that is returned due to insufficient funds.

20.     The same check, ACH, or other electronic payment on an account is not a new "item" each time it is rejected for payment then reprocessed, especially when—as here—Plaintiff took no action to resubmit the transaction.

21.     Even if Carver Bank reprocesses an instruction for payment, it is still the same item. The Bank's reprocessing is simply another attempt to effectuate an accountholder's original order or instruction.

22.     As alleged herein, Plaintiff took only a single action to make a single payment; she therefore created only one transaction and may be charged only a single fee.

23.     As the disclosures described above show, Plaintiff never agreed that Carver Bank may assess multiple NSF Fees for a transaction that was returned for insufficient funds and later reprocessed one or more times and returned again.

24.     In sum, Carver Bank promised that one $35 NSF Fee will be assessed per item, and this must mean all iterations of the same instruction for payment. As such, Carver Bank breached the contract when it charged more than one fee per transaction.

25.     A reasonable consumer would understand that Carver Bank's Account Documents permit it to assess an NSF Fee only once per "item."

26.     Taken together, the representations and omissions identified above convey to customers that all submissions for payment of the same transaction will be treated as the same "item," which the Bank will either pay (resulting in an overdraft item) or return (resulting in a returned transaction) when it decides there are insufficient funds in the account. Nowhere do Carver Bank and its customers agree that Carver Bank will treat each reprocessing of a check or ACH payment as a separate transaction, subject to additional fees.

27.     Customers reasonably understand, based on the language of the Account Documents, that the Bank's attempts to reprocess checks or ACH payments are simply additional attempts to complete the original order or instruction for payment, and as such, will not trigger additional NSF Fees. In other words, it is always the same transaction.

28.     Banks like Carver Bank that employ this abusive multiple fee practice know how to plainly and clearly disclose it. Indeed, other banks and credit unions that engage in this abusive practice require their accountholders to expressly authorize it—something Carver Bank only recently did.

29.     For example, First Hawaiian Bank engages in the same abusive practices as Carver Bank,

but at least currently discloses it in its online banking agreement, in all capital letters, as follows:

> YOU AGREE THAT MULTIPLE ATTEMPTS MAY BE MADE TO SUBMIT A
> RETURNED ITEM FOR PAYMENT AND THAT **MULTIPLE FEES MAY BE
> CHARGED TO YOU AS A RESULT OF A RETURNED ITEM AND
> RESUBMISSION**.

*Terms and Conditions of FHB Online Services*, First Hawaiian Bank 40, https://bit.ly/2KWMvTg (last

accessed Jan. 28, 2021) (emphasis added).

30.     Klein Bank similarly states in its online banking agreement:

> [W]e will charge you an NSF/Overdraft Fee each time: (1) a Bill Payment (electronic or
> check) is submitted to us for payment from your Bill Payment Account when, at the time
> of posting, your Bill Payment Account is overdrawn, would be overdrawn if we paid the
> item (whether or not we in fact pay it) or does not have sufficient available funds; or (2)
> we return, reverse, or decline to pay an item for any other reason authorized by the terms
> and conditions governing your Bill Payment Account. **We will charge an NSF/Overdraft
> Fee as provided in this section regardless of the number of times an item is submitted
> or resubmitted to us for payment, and regardless of whether we pay the item or
> return, reverse, or decline to pay the bill payment.**

*Consumer Account Terms and Conditions*, Klein Bank 4 (Jan. 2013), https://bit.ly/2KVCkhI (emphasis

added).

31.     Central Pacific Bank, a leading bank in Hawai'i, states in its deposit account under the

"MULTIPLE NSF FEES" subsection:

> Items and transactions (such as, for example, checks and electronic transactions/payments)
> returned unpaid due to insufficient/non-sufficient funds ("NSF") in your account, may be
> resubmitted one or more times for payment, and a returned item/transaction fee will be
> imposed on you each time an item and transaction resubmitted for payment is returned due
> to insufficient/non-sufficient funds.

*Miscellaneous    Fee    Schedule*,    Central    Pacific    Bank    1    (Jan.    4.    2021),

https://www.cpb.bank/media/2776/fee-001.pdf (last accessed June 4, 2021).

32.     BP Credit Union likewise states: "We may charge a fee each time an item is submitted or

resubmitted for payment; therefore, you may be assessed more than one fee as a result of a returned item

and resubmission(s) of the returned item." *Membership and Account Agreement,* BP Federal Credit Union, ¶ 14(a), https://www.bpfcu.org/images/docs/membership-agreement.pdf (last accessed June 4, 2021).

33.    Regions Bank likewise states:

> If an item is presented for payment on your account at a time when there is an insufficient balance of available funds in your account to pay the item in full, you agree to pay us our charge for items drawn against insufficient or unavailable funds, whether or not we pay the item. If any item is presented again after having previously been returned unpaid by us, you agree to pay this charge for each time the item is presented for payment and the balance of available funds in your account is insufficient to pay the item.

*Deposit Agreement*, Regions Bank 18 (2018), https://bit.ly/2L0vx6A (last accessed June 4, 2021).

34.    Andrews Federal Credit Union states:

> You understand and agree that a merchant or other entity may make multiple attempts to resubmit a returned item for payment. Consequently, because we may charge a service fee for an NSF item each time it is presented, we may charge you more than one service fee for any given item. Therefore, multiple fees may be charged to you as a result of a returned item and resubmission regardless of the number of times an item is submitted or resubmitted to use for payment, and regardless of whether we pay the item or return, reverse, or decline to pay the item. When we charge a fee for NSF items, the charge reduces the available balance in your account and may put your account into (or further into) overdraft.

*Terms & Conditions*, Andrews Federal Credit Union 17 (Aug. 2020), ¶ 6, https://bit.ly/3iXEdHb (last accessed June 4, 2021).

35.    Consumers Credit Union states:

> Consequently, because we may charge a service fee for an NSF item each time it is presented, we may charge you more than one service fee for any given item. Therefore, multiple fees may be charged to you as a result of a returned item and resubmission regardless of the number of times an item is submitted or resubmitted to us for payment, and regardless of whether we pay the item or return, reverse, or decline to pay the item.

*Member Services Guide*, Consumers Credit Union 5 (Apr. 2020), ¶ 11a, https://bit.ly/3iVM1ta (last accessed June 4, 2021).

36.    Wright Patt Credit Union states:

Consequently, because we may charge a service fee for an NSF item each time it is presented, we may charge you more than one service fee for any given item. Therefore, multiple fees may be charged to you as a result of a returned item and represented regardless of the number of times an item is presented or represented to us for payment, and regardless of whether we pay the item or return, reverse, or decline to pay the item.

*Important Account Information*, Wright Patt Credit Union 13 (July 2020), ¶ 6.1, (last accessed June 4, 2021).

37.     Railroad & Industrial Federal Credit Union states:

Consequently, because we may charge an NSF fee for an NSF item each time it is presented, we may charge you more than one NSF fee for any given item. Therefore, multiple fees may be charged to you as a result of a returned item and resubmitted to us for payment, and regardless of whether we pay the item or return, reverse, or decline to pay the item.

*Important Account Information for Our Members*, Railroad & Industrial Federal Credit Union, p. 2, (Aug. 1, 2019), https://bit.ly/3t5ehhF (last accessed June 4, 2021).

38.     Partners 1st Federal Credit Union states:

Consequently, because we may charge a fee for an NSF item each time it is presented, we may charge you more than one fee for any given item. Therefore, multiple fees may be charged to you as a result of a returned item and resubmission regardless of the number of times an item is submitted or resubmitted to us for payment, and regardless of whether we pay the item or return, reverse, or decline to pay the item.

*Consumer Membership & Account Agreement*, Partners 1st Federal Credit Union, p. 11 (Sept. 15, 2019), https://bit.ly/39pDZWb (last accessed March 2, 2021).

39.     Members First Credit Union states:

We reserve the right to charge an Non-Sufficient Funds Fee (NSF Fee) each time a transaction is presented if your account does not have sufficient funds to cover the transaction at the time of presentment and we decline the transaction for that reason. **This means that a transaction may incur more than one Non-Sufficient Funds Fee (NSF Fee) if it is presented more than once** . . . we reserve the right to charge a Non-Sufficient Funds (NSF Fee) for both the original presentment and the representment[.]

*Membership and Account Agreement*, Members First Credit Union of Florida 3, https://bit.ly/39rRJ2Y (last accessed March 2, 2021).

40.     Community Bank, N.A. states:

We cannot dictate whether or not (or how many times) a merchant will submit a previously presented item. You may be charged more than one Overdraft or NSF Fee if a merchant submits a single transaction multiple times after it has been rejected or returned.

*Overdraft and Unavailable Funds Practices Disclosure*, Community Bank 5 (Nov. 12, 2019),

https://bit.ly/3iY9dH2 (last accessed June 4, 2021).

41.     RBC Bank states:

We may also charge against the Account an NSF fee for each item returned or rejected, including for multiple returns or rejections of the same item.

*Service Agreement for Personal Accounts*, RBC Bank 13 (Sept. 17, 2014), https://bit.ly/3otUtko (last

accessed June 4, 2021).

42.     Diamond Lakes Credit Union states,

Your account may be subject to a fee for each item regardless of whether we pay or return the item. We may charge a fee each time an item is submitted or resubmitted for payment; therefore, you may be assessed more than one fee as a result of a returned item and resubmission(s) of the returned item.

*Membership and Account Agreement*, Diamond Lakes Federal Credit Union, https://bit.ly/39o2P94 (last

accessed June 4, 2021).

43.     Parkside Credit Union states,

If the Credit Union returns the item, you will be assessed an NSF Fee. Note that the Credit Union has no control over how many times an intended payee may resubmit the same check or other item to us for payment. In the event the same check or other item is presented for payment on more than one occasion, your account will be subject to an additional charge on each occasion that the item is presented for payment. There is no limit to the total fees the Credit Union may charge you for overdrawing your account.

*Membership and Account Agreement*, Parkside Credit Union 21 (Jan. 30, 2020), https://bit.ly/3aaXfpG

(last accessed March 2, 2021).

44.     Carver Bank provided no such disclosure until recently, and by not doing so, deceived its

accountholders.

9

**C.**    **The Imposition of Multiple Fees on a Single Transaction Breaches Carver Bank's Duty of Good Faith and Fair Dealing.**

45.    Parties to a contract are required not only to adhere to the express conditions in the contract, but also to act in good faith when they are vested with a discretionary power over the other party. Further, as to bank transactions, the Uniform Commercial Code ("UCC")—which has been adopted by all states—mandates good faith and fair dealing. As such, when a party such as Carver Bank gives itself discretion to act, the party with discretion is required to exercise that power and discretion in good faith. This creates an implied promise to act in accordance with the parties' reasonable expectations and means that the Bank is prohibited from exercising its discretion to enrich itself and gouge its customers. Indeed, the Bank has a duty to honor transaction requests in a way that is fair to Plaintiff and its other customers and is prohibited from exercising its discretion to pile on ever greater penalties.

46.    Here—in the adhesion agreements Carver Bank foisted on Plaintiff and its other customers—Carver Bank has provided itself numerous discretionary powers affecting customers' bank accounts. But instead of exercising that discretion in good faith and consistent with consumers' reasonable expectations, the Bank abuses that discretion to take money out of consumers' accounts without their permission and contrary to their reasonable expectations that they will not be charged multiple fees for the same transaction.

47.    Carver Bank exercises its discretion in its own favor—and to the prejudice of Plaintiff and its other customers—when it defines "item" in a way that directly leads to more NSF Fees. Further, Carver Bank abuses the power it has over customers and their bank accounts and acts contrary to their reasonable expectations under the Account Documents. This is a breach of the Bank's implied covenant to engage in fair dealing and act in good faith.

48.    By exercising its discretion in its own favor—and to the prejudice of Plaintiff and other customers—by charging more than one fee on a single transaction, Carver Bank breaches the reasonable

expectation of Plaintiff and other customers and in doing so violates the implied covenant to act in good faith.

49.    It was bad faith and totally outside Plaintiff's reasonable expectations for Carver Bank to use its discretion to assess multiple NSF Fees for a single attempted payment.

## II.    CARVER BANK CHARGES OD FEES ON TRANSACTIONS THAT DO NOT ACTUALLY OVERDRAW THE ACCOUNT

50.    Plaintiff has a checking account with Carver Bank.

51.    Carver Bank issues debit cards to its checking account customers, including Plaintiff, which allows its customers to have electronic access to their checking accounts for purchases, payments, withdrawals, and other electronic debit transactions.

52.    Pursuant to its Account Documents, Carver Bank charges fees for transactions that purportedly result in an overdraft.

53.    Plaintiff brings this cause of action challenging Carver Bank's practice of charging OD Fees on what are referred to in this complaint as "Authorize Positive, Purportedly Settle Negative Transactions" ("APPSN Transactions").

54.    Here's how it works. At the moment debit card transactions are authorized on an account with positive funds to cover the transaction, Carver Bank immediately reduces accountholders' checking accounts by the amount of the purchase, sets aside funds in a checking account to cover that transaction, and as a result, the accountholder's displayed "available balance" reflects that subtracted amount. Therefore, customers' accounts will always have sufficient available funds to cover these transactions because Carver Bank has already sequestered these funds for payment.

55.    However, Carver Bank still assesses crippling OD Fees on many of these transactions and mispresents its practices in its Account Documents.

11

56.     Despite putting aside sufficient available funds for debit card and other POS transactions at the time those transactions are authorized, Carver Bank later assesses OD Fees on those same transactions when they purportedly settle days later into a negative balance. These types of transactions are APPSN Transactions.

57.     Carver Bank maintains a running account balance in real time, tracking funds accountholders have for immediate use. This running account balance is adjusted, in real-time, to account for debit card transactions at the precise instance they are made. When a customer makes a purchase with a debit card, Carver Bank sequesters the funds needed to pay the transaction, subtracting the dollar amount of the transaction from the customer's available balance. Such funds are not available for any other use by the accountholder, and such funds are specifically associated with a given debit card transaction.

58.     That means when any *subsequent*, intervening transactions are initiated on a checking account, they are compared against an account balance that has already been reduced to account for any earlier debit card transactions. This means that many subsequent transactions incur OD Fees due to the unavailability of the funds sequestered for those debit card transactions.

59.     Still, despite keeping those held funds off-limits for other transactions, Carver Bank improperly charges OD Fees on those APPSN Transactions, even though the APPSN Transactions ***always*** have sufficient available funds to be covered.

60.     Indeed, the Consumer Financial Protection Bureau ("CFPB") has expressed concern with this very issue, flatly calling the practice "unfair" and/or "deceptive" when:

> A financial institution authorized an electronic transaction, which reduced a customer's available balance but did not result in an overdraft at the time of authorization; settlement of a subsequent unrelated transaction that further lowered the customer's available balance and pushed the account into overdraft status; and when the original electronic transaction was later presented for settlement, because of the intervening transaction and overdraft fee, the electronic transaction also posted as an overdraft and an additional overdraft fee was charged. Because such fees caused harm to consumers, one or more supervised entities were found to have acted unfairly when they charged fees in the manner described above. Consumers likely had no reason to anticipate this practice, which was not appropriately

disclosed. They therefore could not reasonably avoid incurring the overdraft fees charged. Consistent with the deception findings summarized above, examiners found that the failure to properly disclose the practice of charging overdraft fees in these circumstances was deceptive. At one or more institutions, examiners found deceptive practices relating to the disclosure of overdraft processing logic for electronic transactions. Examiners noted that these disclosures created a misimpression that the institutions would not charge an overdraft fee with respect to an electronic transaction if the authorization of the transaction did not push the customer's available balance into overdraft status. But the institutions assessed overdraft fees for electronic transactions in a manner inconsistent with the overall net impression created by the disclosures. Examiners therefore concluded that the disclosures were misleading or likely to mislead, and because such misimpressions could be material to a reasonable consumer's decision-making and actions, examiners found the practice to be deceptive. Furthermore, because consumers were substantially injured or likely to be so injured by overdraft fees assessed contrary to the overall net impression created by the disclosures (in a manner not outweighed by countervailing benefits to consumers or competition), and because consumers could not reasonably avoid the fees (given the misimpressions created by the disclosures), the practice of assessing fees under these circumstances was found to be unfair.

Consumer Financial Protection Bureau, Winter 2015 "Supervisory Highlights."

61.     There is no justification for these practices, other than to maximize Carver Bank's OD Fee revenue. APPSN Transactions only exist because intervening checking account transactions supposedly reduce an account balance. But Carver Bank is free to protect its interests and either reject those intervening transactions or charge OD Fees on those intervening transactions—and it does the latter to the tune of millions of dollars each year. But Carver Bank was not content with these millions in OD Fees. Instead, it sought millions *more* in OD Fees on these APPSN Transactions.

62.     Besides being unfair and unjust, these practices breach contract promises made in Carver Bank's adhesion contracts—contracts which fail to inform accountholders about the true nature of Carver Bank's processes and practices. These practices also exploit contractual discretion to gouge accountholders.

63.     In plain, clear, and simple language, the Account Documents covering OD Fees promise that Carver Bank will only charge OD Fees on transactions that have insufficient funds to cover that transaction.

64.    In short, Carver Bank is not authorized by contract to charge OD Fees on transactions that have not overdrawn an account, but it has done so and continues to do so.

**A.    *Mechanics of a Debit Card Transaction***

65.    A debit card transaction occurs in two parts. First, authorization for the purchase amount is instantaneously obtained by the merchant from Carver Bank. When a merchant physically or virtually "swipes" a customer's debit card, the credit card terminal connects, via an intermediary, to Carver Bank, which verifies that the customer's account is valid and that sufficient available funds exist to cover the transaction amount.

67.    At this step, if the transaction is approved, Carver Bank immediately decrements the funds in an accountholder's account and sequesters funds in the amount of the transaction but does not yet transfer the funds to the merchant.

68.    Indeed, the entire purpose of the immediate debit and hold of positive funds is to ensure that there are enough funds in the account to pay the transaction when it settles, as discussed in the Federal Register notice announcing revisions to certain provisions of the Truth in Lending Act regulations:

> When a consumer uses a debit card to make a purchase, a hold may be placed on funds in the consumer's account to ensure that the consumer has sufficient funds in the account when the transaction is presented for settlement. This is commonly referred to as a "debit hold." During the time the debit hold remains in place, which may be up to three days after authorization, those funds may be unavailable for the consumer's use for other transactions.

Federal Reserve Board, Office of Thrift Supervision, and National Credit Union Administration, Unfair or Deceptive Acts or Practices, 74 FR 5498-01 (Jan. 29, 2009).

69.    Sometime thereafter, the funds are actually transferred from the customer's account to the merchant's account.

70.    Carver Bank (like all banks and credit unions) decides whether to "pay" debit card transactions at authorization. After that, Carver Bank is obligated to pay the transaction no matter what.

For debit card transactions, that moment of decision can only occur at the point of sale, at the instant the transaction is authorized or declined. It is at that point—and only that point—when Carver Bank may choose to either pay the transaction or decline it. When the time comes to actually settle the transaction, it is too late—the financial institution has no discretion and must pay the charge. This "must pay" rule applies industry wide and requires that, once a financial institution authorizes a debit card transaction, it "must pay" it when the merchant later makes a demand, regardless of other account activity. *See* Electronic Fund Transfers, 74 Fed. Reg. 59033-01, 59046 (Nov. 17, 2009).

71.     There is no change—no impact whatsoever—to the available funds in an account when this step occurs.

### B.     *Carver Bank's Account Contract*

72.     Plaintiff has a checking account with Carver Bank, which is governed by Carver Bank's standardized Account Documents.

73.     The Account Documents indicate that Carver Bank will only pay overdrafts when an accountholder lacks sufficient funds to pay for a transaction:

> **Overdrafts -** You understand that we may, at our discretion, honor withdrawal requests that overdraw your account.  However, the fact that we may honor withdrawal requests that overdraw the account balance does not obligate us to do so later. So you can NOT rely on us to pay overdrafts on your account regardless of how frequently or under what circumstances we have paid overdrafts on your account in the past. We can change our practice of paying overdrafts on your account without notice to you. You can ask us if we have other account services that might be available to you where we commit to paying overdrafts under certain circumstances, such as an overdraft protection line-of-credit or a plan to sweep funds from another account you have with us. You agree that we may charge fees for overdrafts. For consumer accounts, we will not charge fees for overdrafts caused by ATM withdrawals or one-time debit card transactions if you have not opted-in to that service. We may use subsequent deposits, including direct deposits of social security or other government benefits, to cover such overdrafts and overdraft fees.

Ex. A at 2.

74.    For APPSN Transactions, which are immediately deducted from a positive account balance and should be held aside for payment of that same transaction, there are always funds to cover those transactions—yet Carver Bank assesses OD Fees on them anyway.

75.    The above promises mean that transactions are only overdraft transactions when they are authorized into a negative account balance. Of course, that is not true for APPSN Transactions.

76.    APPSN transactions are always initiated at a time when there are sufficient available funds in the account.

77.    In fact, Carver Bank actually authorizes transactions on positive funds, claims to set those funds aside on hold, but then fails to use those same funds to settle those same transactions. Instead, it uses a secret posting process described below.

78.    All the above representations and contractual promises are untrue. In fact, Carver Bank charges OD Fees even when sufficient funds exist to cover transactions that are authorized into a positive balance. No express language in any document states that Carver Bank may impose OD Fees on any APPSN Transactions.

79.    First, and most fundamentally, Carver Bank charges OD Fees on debit card transactions for which there are sufficient funds available to cover the transactions. That is despite contractual representations that Carver Bank will only charge OD Fees on transactions with insufficient available funds to cover a given transaction.

80.    Carver Bank assesses OD Fees on APPSN Transactions that **_do_** have sufficient funds available to cover them throughout their lifecycle.

81.    Carver Bank's practice of charging OD Fees even when sufficient available funds exist to cover a transaction violates a contractual promise not to do so. This discrepancy between Carver Bank's actual practice and the contract causes accountholders like the Plaintiff to incur more OD Fees than they should.

16

82.     Next, sufficient funds for APPSN Transactions are actually debited from the account immediately, consistent with standard industry practice.

83.     Because these withdrawals take place upon initiation, they cannot be re-debited later. But that is what Carver Bank does when it re-debits the account during a secret batch posting process.

84.     In reality, Carver Bank's actual practice is to deduct the same debit card transaction twice to determine if the transaction overdraws an account—both at the time a transaction is authorized and later at the time of settlement.

85.     At the time of settlement, however, an available balance *does not change at all* for these transactions previously authorized into good funds. As such, Carver Bank cannot then charge an OD Fee on such transaction because the available balance has not been rendered insufficient due to the pseudo-event of settlement.

86.     Upon information and belief, something more is going on: at the moment a debit card transaction is getting ready to settle, Carver Bank does something new and unexpected, during the middle of the night, during its nightly batch posting process. Specifically, Carver Bank releases the hold placed on funds for the transaction for a split second, putting money back into the account, then re-debits the same transaction a second time.

87.     This secret step allows Carver Bank to charge OD Fees on transactions that never should have caused an overdraft—transactions that were authorized into sufficient funds, and for which Carver Bank specifically set aside money to pay them.

88.     This discrepancy between Carver Bank's actual practices and the contract causes accountholders to incur more OD Fees than they should.

89.     In sum, there is a huge gap between Carver Bank's practices as described in the Account Documents and Carver Bank's practices in reality.

### C.    *Carver Bank Abuses Contractual Discretion*

90.    Carver Bank's treatment of debit card transactions to charge OD Fees is not simply a breach of the express terms of the numerous Account Documents. In addition, Carver Bank exploits contractual discretion to the detriment of accountholders when it uses these policies.

91.    Carver Bank uses its contractual discretion to cause APPSN Transactions to incur OD Fees by knowingly authorizing later transactions that it allows to consume available funds previously sequestered for APPSN Transactions.

92.    Carver Bank uses this contractual discretion unfairly to extract OD Fees on transactions that no reasonable accountholder would believe could cause OD Fees.

### D.    *Reasonable Accountholders Understand Debit Card/POS Transactions Are Debited Immediately*

93.    The assessment of OD Fees on APPSN Transactions is fundamentally inconsistent with immediate deduction and holding of funds for debit card/POS transactions. That is because, if funds are immediately debited from the balance and held, they cannot be depleted by intervening transactions (and it is that subsequent depletion that is the necessary condition of APPSN Transactions). If funds are immediately debited from the available balance, then they are necessarily available to be applied to the debit card transactions for which they are debited.

94.    Carver Bank was and is aware that this is precisely how accountholders reasonably understand such transactions to work.

95.    Carver Bank knows that many accountholders prefer debit cards for this very reason. Research indicates that accountholders prefer debit cards as a budgeting device because they do not allow debt like credit cards do, and because the money comes directly out of a checking account.

96.    Consumer Action, a national nonprofit consumer education and advocacy organization, advises consumers determining whether they should use a debit card that "[t]here is no grace period on

debit card purchases the way there is on credit card purchases; the money is immediately deducted from your checking account. Also, when you use a debit card you lose the one or two days of 'float' time that a check usually takes to clear." *What Do I Need to Know About Using a Debit Card?*, Consumer Action (Jan. 14, 2019), https://www.consumer-action.org/helpdesk/articles/what_do_i_need_to_know_about_using_a_debit_card (last visited June 4, 2021).

97.     Further, Consumer Action informs consumers that "Debit cards offer the convenience of paying with plastic without the risk of overspending. When you use a debit card, you do not get a monthly bill. You also avoid the finance charges and debt that can come with a credit card if not paid off in full." *Understanding Debit Cards*, Consumer Action, http://www.consumer-action.org/english/articles/understanding_debit_cards (last visited June 4, 2021).

98.     This understanding is a large part of the reason that debit cards have risen in popularity. The number of terminals that accept debit cards in the United States increased by approximately 1.4 million in a recent five year period and, with that increasing ubiquity, consumers have (along with credit cards) viewed debit cards "as a more convenient option than refilling their wallets with cash from an ATM." Maria LaMagna, *Debit Cards Gaining on Case for Smallest Purchases,* MarketWatch, Mar. 23, 2016, http://www.marketwatch.com/story/morepeople-are-using-debit-cards-to-buy-a-pack-of-gum-2016-03-23.

99.     Not only have accountholders increasingly transitioned from cash to debit cards, but they believe that a debit card purchase is the fundamental equivalent of a cash purchase, with the swipe of a card equating to handing over cash, permanently and irreversibly.

100.     Carver Bank was aware of accountholder perception that debit transactions reduce an available balance *in a specified order*—namely, the moment they are actually initiated—and its account agreement only supports this perception.

### E.     Plaintiff's Experience

101.    As an example, on July 7, 2021, Plaintiff was assessed OD Fees for debit card transactions that settled that day, despite the fact that positive funds were deducted immediately, prior to that day, for the transaction on which Plaintiff was assessed the OD Fee. At the time that the positive funds were deducted, Plaintiff had a positive balance, which would not have caused an OD Fee.

## CLASS ACTION ALLEGATIONS

102.    Plaintiff brings this action on behalf of herself, and all others similarly situated pursuant to Rule 23 of the Federal Rules of Civil Procedure.  This action satisfies the numerosity, commonality, typicality, adequacy, predominance and superiority requirements of Rule 23.

103.    The proposed classes are defined as:

All Carver Bank checking account holders in the United States who, during the applicable statute of limitations, were charged multiple fees on the same item (the "National Multi NSF Class").

All Carver Bank checking account holders in the State of New York who, during the applicable statute of limitations, were charged multiple fees on the same item (the "New York Multi NSF Subclass").

All Carver Bank checking account holders in the United States who, during the applicable statute of limitations, were charged OD Fees on transactions that were authorized into a positive available balance (the "National APPSN Class").

All Carver Bank checking account holders in the State of New York who, during the applicable statute of limitations, were charged OD Fees on transactions that were authorized into a positive available balance (the "New York APPSN Subclass").

The classes are collectively referred to as the "Classes."

104.    Plaintiff reserves the right to modify or amend the definition of the proposed Classes before the Court determines whether certification is appropriate.

105.    Excluded from the Classes are Carver Bank, its parents, subsidiaries, affiliates, officers and directors, any entity in which Carver Bank has a controlling interest, all customers who make a timely

election to be excluded, governmental entities, and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

106.    The members of the Classes are so numerous that joinder is impractical.  The Classes consist of thousands of members, the identity of whom is within the knowledge of and can be ascertained only by resort to Carver Bank's records.

107.    The claims of Plaintiff are typical of the claims of the Classes in that she, like all Class members, was charged improper NSF Fees and OD Fees. Plaintiff, like all Class members, has been damaged by Carver Bank's misconduct in that she paid improper NSF Fees and OD Fees.  Furthermore, the factual basis of Carver Bank's misconduct is common to all Class members, and represents a common thread of unfair and unconscionable conduct resulting in injury to all members of the Classes.

108.    There are numerous questions of law and fact common to the Classes and those common questions predominate over any questions affecting only individual Class members.

109.    Among the questions of law and fact common to the Classes are whether Carver Bank:

   a.    Charged multiple fees on a single transaction;

   b.    Charged OD Fees on transactions when those transactions did not overdraw accounts;

   c.    Breached its contract with consumers by charging OD Fees on transactions when those transactions did not overdraw accounts;

   d.    Breached the covenant of good faith and fair dealing by charging OD Fees on transactions when those transactions did not overdraw accounts;

   e.    Whether Plaintiff and the Classes were damaged by Carver Bank's conduct and if so, the proper measure of damages.

110.    Plaintiff is committed to the vigorous prosecution of this action and has retained competent counsel experienced in the prosecution of class actions and, in particular, class actions on behalf of

21

consumers and against financial institutions.  Accordingly, Plaintiff is an adequate representative and will fairly and adequately protect the interests of the Classes.

111.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Since the amount of each individual Class member's claim is small relative to the complexity of the litigation, and due to the financial resources of Carver Bank, no Class member could afford to seek legal redress individually for the claims alleged herein.  Therefore, absent a class action, the Class members will continue to suffer losses and Carver Bank's misconduct will proceed without remedy.  Moreover, given that the improper fees were assessed in a uniform manner, common issues predominate over any questions, to the extent there are any, affecting only individual members.

112.    Even if Class members themselves could afford such individual litigation, the court system could not.  Given the complex legal and factual issues involved, individualized litigation would significantly increase the delay and expense to all parties and to the Court.  Individualized litigation would also create the potential for inconsistent or contradictory rulings.  By contrast, a class action presents far fewer management difficulties, allows claims to be heard which might otherwise go unheard because of the relative expense of bringing individual lawsuits, and provides the benefits of adjudication, economies of scale and comprehensive supervision by a single court.

### FIRST CLAIM FOR RELIEF
**Breach of Contract and Breach of the Covenant of Good Faith and Fair Dealing**
**(On Behalf of Plaintiff and the Classes)**

113.    The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

114.    Plaintiff and Carver Bank have contracted for bank account deposit, checking, ATM, and debit card services. Prior to May 1, 2021, that contract did not permit Carver Bank to charge multiple fees for the same item.  Moreover, the contract also does not permit Carver Bank to charge OD Fees on transactions that do not actually overdraw an account.

22

115.    Further, under the laws of New York, good faith is an element of every contract, including the instant Account Documents pertaining to the assessment of OD Fees and NSF Fees. Whether by common law or statute, all such contracts impose upon each party a duty of good faith and fair dealing. Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit – not merely the letter – of the bargain. Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form. Evading the spirit of the bargain and abusing the power to specify terms constitute examples of bad faith in the performance of contracts.

116.    Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes his conduct to be justified. A failure to act in good faith may be overt or may consist of inaction, and fair dealing may require more than honesty. Examples of violations of good faith and fair dealing include evasion of the spirit of the bargain, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance.

117.    Carver Bank has breached the covenant of good faith and fair dealing in its contract with customers by charging multiple fees for the same item.

118.    Carver Bank has breached the covenant of good faith and fair dealing in its contract with customers by charging OD Fees on transactions that do not actually overdraw the account *i.e.* when there were sufficient actual funds in the account to cover the transaction.

119.    Carver Bank also breached the express terms of its contract with Plaintiff and the Multi NSF Classes by charging multiple fees on the same item.

120.    Carver Bank also breached the express terms of its contract with Plaintiff and the APPSN Classes by charging OD Fees on transactions that do not actually overdraw the account *i.e.* when there were sufficient actual funds in the account to cover the transaction.

121.    Plaintiff and members of the Classes have performed all, or substantially all, of the obligations imposed on them under the contract.

122.    Plaintiff and members of the Classes have sustained damages as a result of Carver Bank's breach of the contract.

**SECOND CLAIM FOR RELIEF**
**Violations of New York General Business § 349, *et seq*.**
**(On Behalf of Plaintiff and the New York Subclass)**

123.    The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

124.    This claim is asserted on behalf of the members of the New York Sub-Classes under New York's consumer protection law, New York General Business Law § 349, et seq. ("GBL § 349").

125.    Carver Bank engaged in deceptive acts or practices relating to the imposition of overdraft fees on consumers, in violation of GBL § 349, N.Y. Gen. Bus. Law § 349(a).

126.    GBL § 349 prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service." *Id*.

127.    Carver Bank engaged in deceptive acts or practices, unlawful conduct, made affirmative misrepresentations, or otherwise violated GBL § 349 by, *inter alia*, knowingly and intentionally employing an unfair and deceptive policy as described herein.

128.    Carver Bank also engaged in unlawful conduct, made affirmative misrepresentations, or otherwise violated GBL § 349.

129.    Carver Bank's deceptive acts or practices were "consumer-oriented." *E.g., Wilson v. Northwestern Mut. Ins. Co*., 625 F.3d 54, 64 (2d Cir. 2010) (quoting *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank*, NA., 85 N.Y.2d 20, 623 N.Y.S.2d 529, 532-33, 647 N.E.2d 741 (1995)).

130.    Carver Bank intended that Plaintiff and the members of the New York Subclasses rely on the acts of concealment and deception, so that Plaintiff and the members of the New York Subclasses would incur additional NSF Fees and OD Fees.

131.    Carver Bank's conduct caused Plaintiff and the members of the New York Subclasses to suffer ascertainable losses in the form of improper NSF Fees and OD Fees that, but for Carver Bank's unfair and deceptive policies, would not otherwise have been imposed.

132.    A causal relationship exists between Carver Bank's unlawful conduct and the ascertainable losses suffered by Plaintiff and the members of the New York Subclasses. Had Carver Bank kept its promises, Plaintiff and the members of the New York Subclasses would not have incurred certain OD Fees in violation of GBL § 349.

133.    As redress for Carver Bank's repeated and ongoing violations of GBL § 349, Plaintiff and the New York Subclasses are entitled to, *inter alia*, actual damages, treble damages, declaratory relief, and reasonable attorney's fees. N.Y. Gen. Bus. Law. § 349(h).

**THIRD CLAIM FOR RELIEF**
**VIOLATION OF THE EFTA (REGULATION E), 12 C.F.R. § 1005, *et seq*.;**
**AUTHORITY DERIVED FROM 15 U.S.C. § 1693, *et seq*.**
**(On Behalf of Plaintiff and the APPSN Class)**

134.    The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

135.    Carver Bank charged Plaintiff overdraft fees as a result of ATM and non-recurring debit card transactions authorized into a positive balance.

136.    Carver Bank failed to provide Plaintiff disclosures that fully and accurately described Carver Bank's overdraft service – i.e., the service under which Carver Bank would assess overdraft fees as a result of ATM and non-recurring debit card transactions authorized into a positive balance. Specifically, prior to enrolling Plaintiff in the service and charging Plaintiffs overdraft fees as a result of

ATM and non-recurring debit card transactions authorized into a positive balance, Carver Bank failed to provide Plaintiff a segregated, non-misleading and truthful description of its practices, as part of the overdraft service, in assessing overdraft fees as a result of one-time debit card transactions, as required by 12 C.F.R. § 1005.17.

137.    Plaintiff was assessed overdraft fees as a result of debit card transactions being authorized into a positive balance, without her informed, affirmative and written consent, in violation of Regulation E (12 C.F.R. §§1005 et seq.), whose "primary objective" is "the protection of consumers" (§1005.l(b)) and which "carries out the purposes of the [Electronic Fund Transfer Act 15 U.S.C. §§1693 et seq.), the "EFTA"] (§1005. l(b)), whose express "primary objective" is also "the provision of individual consumer rights" (15 U.S.C. §1693(b)).

138.    Due to Carver Bank's violation of Regulation E (12 C.F.R. § 1005.17), Plaintiff and all members of the APPSN Classes are entitled to, and do seek, actual and statutory damages, as well as attorneys' fees and costs of suit pursuant to 15 U.S.C.A. § 1693m.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff and members of the Classes demand a jury trial on all claims so triable and judgment as follows:

A.    An order certifying that this action may be maintained as a class action, that Plaintiff be appointed Class Representative and that Plaintiff's counsel be appointed Class Counsel;

B.    Declaring Carver Bank's OD and NSF Fee policies and practices to be wrongful, unfair, and unconscionable;

C.    Ordering Carver Bank to immediately cease the wrongful conduct set forth above and enjoining Carver Bank from conducting business via the unlawful and unfair business acts and practices complained of herein;

D.    Restitution of all wrongful OD and NSF Fees paid to Carver Bank by Plaintiff and members of the Classes as a result of the wrongs alleged herein in an amount to be determined at trial;

E.    Actual and exemplary damages in an amount to be determined at trial;

F.    Pre-judgment interest at the maximum rate permitted by applicable law;

G.    Costs and disbursements assessed by Plaintiff in connection with this action, including reasonable attorneys' fees pursuant to applicable law;

H.    Granting such other relief as the Court deems just and proper.

## TRIAL BY JURY IS DEMANDED

Plaintiff respectfully demands a trial by jury on all issues so triable.

Dated:  April 13, 2022                           Respectfully submitted,

                                                 **SHAMIS & GENTILE, P.A.**
                                                 /s/ Andrew J. Shamis
                                                 Andrew J. Shamis, Esq.
                                                 New York Bar No. 5195185
                                                 ashamis@shamisgentile.com
                                                 14 NE 1st Avenue, Suite 705
                                                 Miami, Florida 33132
                                                 Telephone: 305-479-2299

                                                 Jeffrey D. Kaliel
                                                 KALIELGOLD PLLC
                                                 1100 15th Street NW, 4th
                                                 Floor Washington, D.C.  20005
                                                 (202) 350-4783
                                                 *jkaliel@kalielpllc.com*

                                                 Sophia G. Gold
                                                 KALIELGOLD PLLC
                                                 950 Gilman Street, Suite 200
                                                 Berkeley, CA 94710
                                                 (202) 350-4783
                                                 sgold@kalielgold.com